Number 14-4752, Ms. Handorff and Mr. Pelkey. May it please the Court, my name is Karen Handorff and I represent the plaintiffs in this case. And with your permission, I'd like to reserve three minutes for rebuttal. That's fine. There were two issues on appeal. The first issue is whether the District Court abused its discretion when it upheld the Administrative Committee's decision to deny severance benefits to the plaintiffs. And the second question is whether the District Court erred when it determined that the class only consisted of individuals who had filed benefit claims within the time period of the plan. The plaintiffs were employed by Pfizer for more than 20 years and they staffed the benchmark federal credit union in anticipation of an acquisition by Pfizer. We got the facts here. Pfizer buys Wyeth. Benchmark served as the credit union for Wyeth. They then served and their employees served in effect as the credit union for Pfizer. They're terminated the next morning. They're hired by Benchmark itself. And then the question becomes whether Benchmark is the successor to the company. That's the interpretation of the plan. And your argument that they are not, first of all, what was lost by these employees? Because they say they lost severance benefits, but they weren't really, I mean, they got a termination that technically said they're severed, but they're not really severed. I mean, the next day they go to the same desk, make the same money, have the same title, et cetera. Yes, but your honor, that was not the terms of the plan. The terms of the plan required them to get benefits unless they were hired by a successor employer. Well, that all depends on what successor employer means. I mean, successor company to the company, that's struck me as rather awkward language. Is that language that you've seen with some frequency in these ERISA plans? Well, I think that the language in ERISA plans are different in all severance plans. And I think there are a number of cases that point to the fact that you really have to look at the plan language. So it's individualized and context matters, right? Exactly. So this clearly is not a successor company in the corporate law. I think Mr. Pelkey may concede that, we'll see. But if we assume that this is not a successor company in the corporate law sense, it does not necessarily follow, does it, that for purposes of employment it may yet be a successor company? Well, the terms of the plan, first of all, do not, they don't look, the plan doesn't say the purpose is to provide benefits in the case of unemployment. It says the purpose of the plan is to aid in the transition of employees after Pfizer acquires Wyeth. And the particular plan terms, I think, are very important because the plan terms say that you get termination benefits unless you're retired, you're terminated for cause, or if you're transferred to a successor company of the company or any of its affiliates. And then the plan later defines successor company of the company in Article 8, Section 8.3, which provides that the obligations under the plan shall be binding on any organization which shall succeed to all or substantially to all of the assets of the company or otherwise be a successor of the company by operation of law. But you went right to the point of my question. The language you just quoted, that's involving change of control. Corporate law matters. Not employment matters. Right. And so... So don't we need to focus on the part of the plan that deals with employment rather than corporate succession, change of control? But there is no language in the plan that talks about employment. Which is why the board, the administrative review, concluded it was ambiguous. Well, no, the board, first of all, the question was whether the employment was terminated and the employment was definitely terminated. They got termination notices, they got COBRA notices, everything dealing with termination. They were hired again by Benchmark, but they applied for jobs at Benchmark and Benchmark could have rejected them. So under the terms... But they didn't reject a single person, did they? Excuse me? Yeah, I'm sorry. They didn't reject a single person, did they? No, they did not reject any person, but they could have. All right, so if we rule in your favor in this case and then Benchmark decides to terminate all of your clients, the next day they get no further benefits or they get severance benefits? Well, under the continuity agreement, supposedly they could get benefits. So they get double? No. The continuity agreement doesn't give third-party beneficiaries any rights under the plan. And the continuity agreement is not an amendment to this plan. It is simply a freestanding agreement. So under the ERISA, you look to the terms of the plan. And the terms of the plan don't require that you be unemployed in order to get benefits. The plan doesn't say that if you're employed by somebody after you're terminated that you don't get benefits. It doesn't say that it's a successor employer. It says a successor company of the company, and it defines that as somebody who actually has taken over the assets of, in this case, Wyeth. And so like when, for example, Pfizer took over the assets of Wyeth, there was no termination. There was definitely a transfer of employment. And when those people transferred from Wyeth to Pfizer, they never made a claim for benefits. And they never got benefits. So it was only in this particular situation where, I mean, things are happening here. It is not seamless completely. They were working for a Fortune 50 company. Now they're working for a federal credit union. They were working for a company in which they had 401k benefits. Obviously, if you have a Fortune 50 company, you're going to have a more rich 401k plan than if you have benefits under benchmark. They were no longer able to vest under the pension plan. So if they had gotten their benefits under the severance plan, some of these participants would have been able to retire earlier. They lost the rule of 70, and they lost some prescription drug benefits. Yes. So they did lose things. And as courts have continually stated with respect to severance plans. What's the value of what you're saying that they lost, the rule of 70 and prescription? For these particular participants, I don't think it's ever been actually calculated, but it's thousands of dollars. And if they had been able to get severance benefits. Per person. Per person, yes. Because it increases their pension going forward forever. But they get these things only if they were terminated by a successor company of the company. Yes. Okay. Why don't we hear from Mr. Pelkey, and then get you back in rebuttal, because I have some questions for him. Good morning. May it please the court, I'm David Pelkey for the appellees. We can start with questions. Let me start, yeah, let me start with the benchmark. Is benchmark physically located on the Pfizer campus? I believe it was located on or abutting the Wyeth campus at the time. Which is now Pfizer. Yeah, and there's some in the briefing that you have, all the facts. There's some in the history of Wyeth, or of benchmark as being a single employer credit unit. Is that its only location, only has one or more? Yes. Since this, I don't know what's happened with it, but at the time, it was only to serve Wyeth and Pfizer employees, was the only people who were eligible. And that continued, I believe, for the length of the change in control period. Which is very comfortable. What was the reasoning behind the decision to have the benchmark employees on the Pfizer payroll when Pfizer took over Wyeth? It's not on the record what the business decision was, in terms of Pfizer wanting to get out of the credit union business. I don't know what the exact reasoning there was. I do believe it was the only entity that Pfizer had at that time that was in that arena, in the financial services arena. And then just one other preliminary question. The district court granted a motion for judgment on the administrative record. What is that? I've never seen that done. You know, it's an interesting procedural question. There are, I've done a few of these cases, and there's courts who have approached it in different ways. Some courts have said, well, summary judgment doesn't really work here, because we're not asking whether or not there's a material issue of fact remaining. We're looking at, the district court was already sitting in a quasi-appellate function. We're now reviewing the district court. We're really just trying to review the decision that was done on the administrative record in a case like that. So I've seen it done both ways, where courts have been hesitant about embracing all the rules that they say. Yeah, I just didn't see anything authorizing such a mechanism under the federal rules of civil procedure. I, yeah, I am not aware of that. Maybe it's supposed to be the equivalent of like a motion for summary judgment. I don't, I just don't know. And I think Judge Shapiro did view it under Rule 56 and applied those principles. And then I guess I do have one other factual question. Are the administrative committee's benefits determined by a majority vote? Three out of five, or do you need five out of five? Yes, so that's how the voting works on the administrative committee. Three out of five, or five out of five? Three out of five, but majority vote. So let me ask you this. Imagine that Pfizer, as part of a desire to have healthy meal options, decides to open a healthy McDonald's on site. And they say, okay, but McDonald's, you don't have to bring your employees in. We're going to have Pfizer employees behind the counter. And after about a year or so, they think, this ain't working. And they ask McDonald's to hire those same employees. Is McDonald's a successor company to Pfizer? I don't know what the plan committee would decide, but I don't think the facts would be capable of lining up the facts perfectly. Because one of the distinctions about benchmark is that the services it was providing were exclusive to Pfizer and Pfizer employees. Nobody else could take part in them. And it should be noted that in the plan, the summary plan description. Well, that's what happened in my example to you. Well, if so, if it had been set up that, and also benchmark was a single entity that didn't sell anywhere else in the world to anyone else. So if there was a food company that was brought in. Does that make a difference here? I think that in terms of how the plan was looking at it, taking this language that I think is evident, I think Judge Shapiro was right, is ambiguous. It needs to be constructed within the employment context. And looking at that language and taking into account the statements made in the summary plan description that they had a question and answer format there. And one of the questions was, can I start working again for Pfizer if I get severance benefits? And the answer is, well, if you're providing services back to Pfizer in any capacity as a contractor, employer or anything else, you cannot until that two year period is over. And the services that these people were giving back, that aspect didn't change. The employer changed from Pfizer to Benchmark. They were doing the same thing, the same desks, same salary. They even had coverage of the same... My example is same thing, same people, same money, same position, same wages, the whole bit. But McDonald's is not buying any assets of Pfizer. No. McDonald's is not having Pfizer consolidated into it. And that seems like our situation here. And what I can't understand is... It may apply, because I think the asset question here is a red herring. Section 8.3 and Section 119 have nothing to do with each other. Section 119 talks about successor company of the company or any of its affiliates, which Judge Hardiman noted is a bit of a tortured formulation. But the inclusion of or any of its affiliates already takes it far afield from the corporate context of 8.3, which talks of successor to the company or substantially all of its assets. That is about the plan applying to whoever... If somebody buys Pfizer after Pfizer acquires Wyeth, it would apply to them equally. Also... And in 8.3, it states that company, the defined term, would then be used to cover anybody, either the company that Wyeth or anybody who acquires Wyeth or substantially all of its assets. So having set that up, if they had meant to only include asset acquirers, they could have used a different formulation instead of successor company of the company or any of its affiliates. So I think the ambiguity of that phrase is clear and I think that it's correct to view it within the employment context, which would fit with your McDonald's example. Let me go to the conflict here. You had three of the five members of the administrative committee were involved in drafting the severance agreement. Is that correct? Well, three of the five were former Wyeth employees who had been involved in putting together the plan. They weren't exclusively involved in it, but they disclosed that they were within the human resources and the benefits department at Wyeth when that was happening. And I realize that's not a sliding scale approach anymore in terms of the deference you give them, but nonetheless, the Howley case from our court, it's a factor. It is a factor. And you consider that factor. And it would seem that they have... Hey, if I drafted this, I want to kind of uphold what I previously drafted when I was an employer of Wyeth and now that I'm advisor, so I'm not going to go against it. Well, first, I know that Judge Shapiro considered it, weighed it, and included it in her balancing of the factors. And as to the structural conflict itself, I think that when one looks at the facts that are in the briefing, I actually think Judge Shapiro may have overweighed the structural conflict. I certainly don't think she underweighed it. And the reason why is from the perspective of the financial interests that she speculates about. So Pfizer had just undertaken a $68 billion merger. The combined assets and revenues of this company was enormous. Why don't Ms. Gandorf's clients feel like Tom Brady going before Roger Goodell with regard to a matter in the NFL? Well, but it goes deeper than that. Because not only is it immaterial in terms of the overall company, but it's immaterial for the employment and the remuneration of the committee members. They are not paid for their service on the committee. They're not evaluated based on their service to the committee. Well, it's not charity work, is it? It's part of their work and it's part of what they do. And they take it very seriously. And if the company had so much money and Benchmark was immaterial to its net assets, then I would suppose that these folks are asking themselves why they would have lost their prescription drug benefits in the rule of seven. Isn't that a fair question that they would have? Well, I think that the fact is there is nothing in the record to show that there was any taint. The case law says that the fact that a structural conflict appears on the surface doesn't mean that the structural conflict exerted any influence. And I think that here we know from the deposition of the 30B6 witness that they were all trained in their fiduciary duties, trained in the two-hat doctrine, which is an accepted doctrine. It was disclosed in the record that these people at the meeting had worked on Wyeth. And I think it was appropriate to have Wyeth people involved. Pfizer just bought this company and this plan was new. And Wyeth came in and Judge Shapiro had found when she reviewed supposed procedural regularities, she found, I think importantly, that that turned out to be important and proper to be able to ask about past Wyeth practices. When would a conflict, you're writing an opinion here, when would a conflict of people on this committee be so significant that it needs to be determined strongly as a factor against the decision of the administrative committee? I think that you see it in case law sometimes, where you see comments coming out of committee or decision makers on memoranda or from their mouths about financial constraints, about problems, we need to keep this down to a certain amount, we cannot grant all of these benefits, we need to keep some of these people. You start to see that the structural conflict, that person wearing two hats being involved in the business side and involved in the benefit side, you see evidence in the record, you see statements, you see things that happens in cases where people say, and it comes out, that there are business considerations that are in operation that appear to be affected. Independent of the language of the plan. Exactly. Or maybe you get a 3-2 vote and the two dissenters say in deposition, hey, here's what was said in the room and it's not consistent with the language of the plan. We just had a meeting talking about how our numbers were a disaster and we needed to do X, Y, Z. So when the business, there's evidence. And here there's just a blank slate on that? There's just no record here? There's nothing that indicates that business considerations were leaking into the examination of the plan. The plan language, how it should be applied, and importantly, what exactly happened to these former employees and whether or not it applied to them. Thank you very much. Ms. Handorf, is Mr. Pelkey correct that there is no smoke here, there's no evidence that you could really point to and say, look, they really had fixated on something that was an improper consideration, it was outside the plan language? Or do you have any evidence in that regard?   I think we do. I think we do. I think that their whole basis for the decision was a continuity agreement, where they think that they had transferred these people over to benchmark, but the continuity agreement was put in place by three of the five members of the committee that made the decision. And Judge Shapiro found that the continuity agreement was in fact designed in part to get them out of their responsibilities for paying severance benefits. So it seems like if you are a member of a committee that you've just put together this continuity agreement designed to eliminate severance benefits, that when you're asked whether you should get severance benefits under the plan, you're going to say, no, you shouldn't because of the continuity agreement. And I think that that is a greater conflict of interest than any I've seen in many of the cases where it's just simply a structural conflict of interest where you pay assets out of the same company that's making the determination. These were personal conflicts of interest. I mean, that was their job to do this, and now it would be very odd for them to turn around and say, well, that's not really what the continuity agreement did. And I think that if you look at the actual record and you look at the decision making, to me it's quite clear that this was a preordained decision they were making because they were relying upon former WIATH practices, but those former WIATH practices had to do with different plans. They had to do with people that were not, that were actually terminated or that actually got, were employed again by a successor employer. So if you look at it, you've got a committee that's using terms that aren't really in the plan. They are dealing with situations... What term's not in the plan? Excuse me? What term is that? You said they're dealing with terms... Well, successor employer is not a term in the plan. The same desk rule is not a term in the plan. Well, but aren't they using those words to try to interpret what is meant by the language successor company of the company? I don't think they ever really go back to the specific language that's in the plan. And in terms of their decision that there's no connection between that definition of successor company of the company, I would point to the fact that Article 8, Section 8.3 says that whenever used by the, and the term company, whenever used by the plan shall mean and include any such organization after the succession. So then you go back to the particular language of the plan that excludes people from severance benefits. It excludes them if they're transferred to a successor company of the company or any of its affiliates. So that language, by the terms of the plan, picks up the language in Article 8, Section 8.3, which defines a successor company as a company that is... That's a company that buys Pfizer, right? It's a company that buys Pfizer, but... So are you saying that successor company to the company is only triggered if Pfizer is acquired by somebody else? Or... Pretty much so, yes, Your Honor. And then it doesn't apply at all here, because Pfizer wasn't acquired, right? Pfizer... No, it doesn't. It triggers the change of control provision. And so, like, when the change of control, under the terms of the plan... If there's a merger or if there's a sale of assets. Excuse me, a sale of assets. So when Pfizer took over Wyeth, it did not trigger the severance provisions in this plan. In fact, Pfizer then acquired the obligations of their plan, which is exactly what happened. So it's not... But do you... Are you saying that this language is not... That Judge Shapiro was wrong when she said the language was ambiguous? Yes, I think it is unambiguous. It's unambiguous. Successor company of the company is unambiguous. I think that... There is no language in the plan that says the term successor employer means. But it's quite clear from statutory construction or plan construction that you look at the plan as a whole and determine what the terms mean. And you say this plan is clear. It's not ambiguous. I think it's not ambiguous. It nowhere says that successor employer is not defined, is not a term of the plan. It doesn't talk about the same desk rule. It doesn't require that the plan committee look to see whether it gets similar benefits or similar pay. Just says if you're terminated, you get benefits. Unless it's for cause, you retire or your employment is transferred to a successor company of the company. And for those reasons, I think that both the district court and the administrative committee used its discretion. Thank you. Okay. Thank you very much. Thank you to both counsel. Well done.